I get screened a lot. I get enhanced screening all the time. Alright, let's do your argument in the final case this morning, 18-4122 Kane County v. United States. And we have for SUA, Mr. Durham. Correct me if I mispronounced. Chad Durham, your honor. On behalf of the appellants and proposed intervenors, Southern Utah Wilderness Alliance and the Wilderness Society.  Applying this court's liberal view of the intervention standard under Rule 24a, the court should reverse the district court's ruling to deny SUA's intervention in this case for two key reasons. First, SUA has a legally protected interest in the scope of the rights of way at issue that may be impaired if intervention is denied. Second, the United States may not adequately represent SUA's interest in the case, which concerns the scope of three rights of way originally found within the original boundary of the Grand Staircase-Escalante National Monument, which I'll refer to as either the monument or the Grand Staircase. In the limited time I have this morning, and I should mention I'd like to reserve three minutes for rebuttal just to sneak that in, I'll focus on the adequacy of representation issue. It's settled law that Rule 24a is satisfied if the intervener shows that representation of their particular interest may be inadequate, and the burden of that showing is minimal. So what in practice does it mean to have adequate representation? Representation is adequate under this court's rulings when, quote, the objective of the applicant for intervention is identical to that of one of the parties. That's from the coalition of New Mexico and Arizona County's case. Moreover, when the party upon which the intervener must rely is the government, the showing of inadequacy is, quote, easily made, end quote, because the government's obligation is to represent the general public interest and not the specific interest of the intervener. That's from the Wild Earth Guardians case from 2009. This is the fifth time we've sought intervention, and what's changed about the government's representations to the court and to your clients? They take the position that they're continuing the course that they've taken since, has it already been 11 years? I think we're going on something like that, Your Honor.  Since SUA first sought intervention in this case in 2009, there was a 2011 bench trial which settled some of the rights of way at issue, not all of them. That led to a subsequent appeal in which this court reversed the district court's ruling with respect to the scope of the three rights of way that are now at issue in this case. And at that time directed precisely what the standard would be that would govern the determination of scope and called out the reasons why the district court's opinion were insufficient at that time. Since then, very little in terms of the actual litigation of the scope has actually happened. In fact, in 2016, after the Trump administration came into office, the first thing that happens on the docket of this case is a joint notice that the parties were pursuing settlement. So rather than litigating the case pursuant to the remand order, the indications were that there was hope to resolve the case. That was a red flag to SUA. That's always a prospect in a case, isn't it? And maybe they'll get a better deal than they'd get from a court through a voluntary settlement. It's always a possibility, Your Honor. But if that standard was broadly applied, that settlement could somehow resolve the case, that could always be used as a basis to bar intervention. Well, you're saying it's always a reason to permit intervention. No, but rather in this case where SUA has previously raised the concerns that are at issue here about the protectable interest that it has, where the government has signaled a willingness to compromise over the scope. And SUA has taken the position that the scope that is appropriate here is the narrowest possible scope in light of the pre-1976 uses. And the questions put to the government, what's your position? What we've heard in the briefing is that their objective is to maintain title, which is very difficult to decode. And in our view, it doesn't suggest that there is any interest in pursuing SUA's particular interest, which is the narrowest possible determination of scope here. Even if you had intervened or were given the right to intervene, does that give you the right to sit at the table for the settlement negotiations? I believe it gives us the right to sit at the table, Your Honor. Do you think so? To sit at the table. What authority? Well, I thought that an intervener, well, first broadly, it doesn't give you the right to participate in the settlement negotiations because you're not the party. So the government, even if you intervene, the government can settle on any terms it wanted to settle on. I think the question is differently framed. Maybe it could sue a block of settlement. And I think the answer to that question is no. No. So you're, so because the intervener does not have the right to settle or to object to the settlement by a party. We could object to the settlement and we could assert that the court should hold a fairness hearing. Does the settlement need court approval? That remains to be determined. One of the reasons that sue... Why couldn't the government just drop the case? I'm sorry? Why couldn't the government just say we've got an inside agreement, we're dismissing the case? The government could do that, Your Honor. Could they at this late date or would they need court approval to dismiss the case after this long time? I don't think that that issue is in the record. And whether or not the government would choose to drop the case would present a different issue on appeal. But it's certainly not the position that they take today. Federal rules say that you can't dismiss without court approval once you've got an answer. And I assume that's long since passed. It has, Your Honor. But the scope of the remand is to go determine what the scope of these three routes is at issue. The parties have submitted different views on what discovery should be allowed. The hypothetical question of whether or not the government could drop the case isn't necessarily before the court today. But as I mentioned a moment ago, that hypothetical possibility where SUA has demonstrated that it otherwise meets the elements of Rule 24, both on an interest and inadequacy basis, shouldn't be used as a tool to block SUA's intervention in the case. Whether the road eventually is 25 feet wide or 30 feet wide, isn't the potential injury to your clients the way the federal government manages either the monument or the federal lands here? You're interested in the wilderness values of these areas above all. And it seems to me that that question is how frequently are visitors allowed, how many visitors are allowed, those sorts of questions and not how wide the road is. I suppose you could come up with a superhighway for me, but I don't think RS-277 would allow that. A couple of relevant points. First, we're not talking about a modest difference between 20 and 30 feet. We're talking about a difference between the beaten path of 10 feet and the state and the county's plan for a 66 foot right of way, which they call a highway. In addition, the fact is that at least two of the routes at issue were within the scope of the monument previously. In December 2017, President Trump, by presidential order, determined that he should cut the monument in half. The result is that those two routes are no longer within the scope or entirely within the scope of the protective monument plan. But there's no claim here about rights emanating from being in a monument. The claim is only under RS-2477, which has nothing to do with whether you're in a monument or not. So I don't even see where that is a claim before us. Your Honor, the reason that that is particularly relevant is the question, to the extent the question from the court is, is the United States an adequate representative of SUA's interests? Under 2477. Under RS-2477. And that doesn't relate at all to whether it is presently in a monument. That relates to what was the use of the land in 1976, an historically fixed fact. The question on RS-2477, under the 2014 remand order, is what should be the width of these routes? What was the use of it in 1976? What were the historical uses and what is the reasonable and necessary use in light of those pre-1976 uses? And the fact that the government has decided to remove monument protection for the surrounding lands and the fact that SUA's unique and particular concern is, in addition to the width of the road, the ability to access currently inaccessible areas of previously monument protected lands that are no longer within the scope of the monument plans, signals that the United States' interest is not really in arguing for the narrowest possible scope, but is instead going to be interested in perhaps a wider scope along the lines of what the state and county have sought. And the fact that these routes are no longer within the scope of the management plan demonstrates that there's likely to be little interest in pursuing the narrowest possible scope from a preservation and conservation perspective, which is what SUA has advocated for. If we conclude that it's a third-party intervener that's yet to establish standing, how do you get there? This court's decision in San Juan addressed the intervention issue, or the standing issue, and made clear that it wasn't required. Yeah, you think that's still good law? Well, I think it is good law to the extent that the Supreme Court case cited by the Appellees doesn't address the question. In that case, it was whether or not an intervener could pursue other claims, in particular a claim for a money judgment. Here, SUA isn't bringing a claim. We're on the side of the defense. So your position is that standing is at least an open legal question? Whether standing is a legal question? Yeah, for third-party interveners such as your clients. I think the relevant question is if you're going to apply the town of Chester case to apply that case on its facts, and say this is an instance where we look at what is the particular relief sought, and does that differ from the party that has Article III standing? And in this case, that's just simply not the case. What if we apply the traditional standing three-part test? That's fine. Under the traditional standing test, if you apply this court's, well, you've got the Lujan case, the Defenders of Wildlife, which says interest in conservation and preservation of species, viewing species, aesthetic interests, those create Article III standing. What's the injury in fact here? The injury in fact is that SUA's interest in limiting the volume of vehicle access across, through, and into wild lands is impaired. And the simple fact is if you build it, they will come. There's a reason that you want to have wider roads. You want to increase the volume of people, of vehicles large and small, of equipment, of livestock. That comes back to my earlier question. Wouldn't the management plan address those types of questions? It used to, but unfortunately the Trump administration decided that these lands shouldn't be within the scope of a management plan. And in addition, the fact that the federal government may maintain ongoing future management responsibility doesn't mean that you eliminate the question of whether or not SUA's stated an interest. Because if you've widened the road to 66 feet, it makes very little difference whether or not the United States is consulted with respect to future maintenance and potential improvements. Would you address standard of review and why you say de novo instead of abuse of discretion? And what the limiting principle is? Why wouldn't it be de novo for 50 motions to intervene? Here, in the limited time I have left, I'd like to reserve some time. I'll give you some rebuttal time. I appreciate that, Your Honor. The question is adequacy of representation. In the San Juan County case, the court said if the facts change in the future and the record shows that the United States is no longer an adequate representative, come back to court. That is this case. We are back here because the facts have changed, as we've discussed and further elaborated in our briefs. If there was an abuse of discretion standard, what that would mean is if there was a finding of adequacy at some point in time, that would become fixed, essentially permanently. And the proposed intervener could present all of the information that it thought demonstrated inadequacy. But if the district court, for whatever reason, was unpersuaded by that, even if this court would view those facts differently, it would be bound to accept the determination on the adequacy question made by the district court. That sets a dangerous precedent because it presumes, which this court never has, that adequacy is a fixed condition. This court has previously determined we know government policy may shift. We know that administrations change. And we know that those changes have substantive effect on the rights of proposed interveners. My time is up, Your Honor, and I'll respond. Thank you, Counsel. Thanks. Good morning, Your Honors. May it please the court, my name is James Masonette. I'll be arguing today on behalf of the United States. Also with me at counsel's table is Sean Welch for Kane County and David Halverson for the state of Utah. I'm going to try to split my time with Mr. Welch. I'm going to try to take nine minutes and save six for him. Can you answer a factual question? Yes, sir. Is there anything in the record about, since there's settlement negotiations going on, is there anything in the record about when there could be a disclosure of any settlement agreement? I don't think there's anything in the record on that, and I'm here to represent today, Your Honor, that there aren't any ongoing settlement discussions. And SUA has made these arguments about settlement. They made these the first time they moved for intervention ten years ago. They said that we had reached a tentative settlement, and we were about to give away the farm on this case. We were going to surrender under political pressure to Kane County's demands for these rights of way, and that wasn't true then, and it's not true now. The parties have talked settlement at some stages of the case. We have never reached a tentative settlement. There are no ongoing settlement talks right now, and I don't frankly anticipate that there's going to be a settlement anytime soon. And you can see that, I mean, fundamentally SUA's argument is that we are going to give in. We're going to capitulate. I mean, as Chief Judge Timkovich has pointed out, the mere fact that a settlement might arise in this case doesn't mean that we won't adequately represent SUA's interests. We might be able to obtain a settlement that is a good settlement, that's beneficial for the United States and SUA's interests. The real argument is that we're going to capitulate, and that's just not true. When the trial court in this case ruled that the Scutumpah Road could be 66 feet wide, and we didn't think that that was based on the historical evidence, we appealed, and this court reversed. We won that case, and so now the Scutumpah Road, because of our advocacy, will be limited to the width shown by the historical evidence, which is going to be somewhere in the range of 20 feet instead of 66 feet. Right now, in early August, we're going to go to trial against Kane County in the companion case, Kane 2, where they're doing what they call a bellwether trial, where we're going to try to present and have some of these difficult legal issues decided so that we can ultimately come to some kind of resolution of the 700 rights of way that are issued in that case. So that's another case where we are litigating and vigorously defending our interests against Kane County. Is SUA a party to that suit? They have, as I understand it, Your Honor, they have been granted permissive intervention in that case, but under a series of conditions to ensure that the case can move forward expeditiously. You know, statewide, we are facing about 12,000 of these claims under RS-2477. So the idea that we're going to give in now is just not true. It wasn't true 10 years ago when SUA said it. We've been vigorously litigating these claims, and let me be clear about what our litigation interest is, since SUA says it hasn't been clear. We, the United States, seek to litigate this case so that any grant of federal property here is construed narrowly. So we're going to argue for the narrowest rights of way, the smallest widths we can, based on the historical evidence that gets developed in this case and based on the legal standards that this court set in its previous SUA decision. And we can't get estoppel against the government, so I'm not asking this question for that purpose. I understand that. But you're saying that your present intention, as you represent to us, is ultimately to get a judicial, reviewable resolution of the scope of the right of way? Well, right. As your president. We are going to advocate in the case for the narrowest right of way, the narrowest grant of federal property possible under the Title 5. And your proposal is that that will be resolved in a public way through a public court? Well, I didn't go so far as to say that, Your Honor. It may have to be litigated in that way. It may be that, for example, after the Bellwether trial or after a series of Bellwether trials. I'm asking about the Bellwether trial, not this one. Well, part of the issue here, and to be perfectly candid with the court, about why it's difficult to settle these is because the parties have not reached agreement on how the legal standards should be applied to these cases. And so those legal issues may get cleared up in these Bellwether trials and we may have a better sense of what the historical evidence shows and what a reasonable agreement would be. So it may be that at some point in the future, we can work out a reasonable settlement with the state on some or all of these claims. So I'm not promising you that we're going to litigate this to the bitter end. Are all those cases in front of the same judge? As I said, we face about 12,000 of these claims statewide, so not all the claims report the same judge. But I think all the Kane, and I'll be correct I'm sure on this, all the Kane County cases are in front of the same court. I'm not concerned about all of these other cases. I'm just asking, and I'm not trying to bind the government at all. I'm just trying to get, and you can say you can't answer it, and I would respect that as a litigation process. But is there anything in the record or any reason to suspect that you can say now that it is the present expectation of the government to get some judicial decision about how to interpret this case? No, I can't say that, Your Honor, because it may be that as the court inquired of opposing counsel, I mean, we could settle this case without a consent decree. We don't need the court to approve our settlement. It's just two property rights owners who are deciding between themselves whose rights are superior and in what way. But the case has been pending a long time. Once you've got an answer and a complaint, don't you need district court approval to dismiss or settle the case? Well, I think we'd need that approval, Your Honor, but in the event that we were able to negotiate an appropriate settlement with Kane County, who would be left to litigate if the parties were unwilling? But if the court is required to approve a settlement after a complaint has been filed, couldn't that court say the public interest is involved and I will want a hearing before I decide whether to approve it or not? You can't unilaterally settle this case now, can you? Yes, that's correct, Your Honor. But the fundamental point here, Your Honor, is because this is a quiet title action, because this is a narrow action about property rights and our property rights vis-a-vis Kane County, we don't have to do the same kind of balancing of interests that is traditionally done in the kinds of cases SUA usually brings, the kind of cases where the Bureau of Land Management is trying to decide how to manage the lands and how to balance all the different competing public interests in the use and management of these lands. In those cases, we have to represent a broader range of interests than SUA's narrow interest in preserving wilderness. Rule 24 is a fairly low bar, it seems, and if there's a possibility that your interests might diverge and that you have more stakeholders than they do, or your stakeholders have a broader view of the public interest than their stakeholders who are focused on wilderness values, it seems that the risk of that diversion would weigh in favor of intervention here. I think that would be true in any challenge to a BLM decision about land management, but here our interests really are focused on marshalling this historical evidence to show as narrow a grant of federal property as possible. It really is very limited. We're not doing a broader balancing of what are the environmental effects of this with or that with, and the court won't be doing that either. We're looking at a very narrow range of interests. Have they been participating as amicus? Yes. No one opposes that and they will continue to participate as amicus, so they will be heard on these issues. Do you have a view on the third-party standing? We didn't advance that argument. We didn't respond to it, I think. Well, we have to decide. I think I would defer to my co-counsel, Mr. Welch, so he can carry that water for him. So in conclusion, Your Honor, SUA's interests are adequately represented in this case because SUA and the United States share the same litigation objective in this narrow property rights case, and because SUA's interests by decision in this case won't be harmed because this is a case about property rights and they don't claim any property rights. They're really fundamentally arguing the same issues that they argued ten years ago, and you rejected them then, and we'd ask that you reject them again now. As we said, SUA will be heard as amicus, but it's a very different thing to allow them to intervene as of right. We have concerns that our interests will be prejudiced if they're allowed to intervene as of right. This is going to be a difficult and time-consuming case. We have to marshal a lot of evidence about how these roads were used before 1976, and that evidence is very difficult to marshal, and it may have to be presented at trial, and adding SUA in as another party as part of that process could complicate it and delay the resolution of the case. Can you just in one, two sentences, say how they will prejudice your interest in that way? Well, I think having another party in that kind of complex trial will make it more complicated. They'll be an intervener. Right, as an intervener. I think it has the potential to delay the resolution of the case, and we have 12,000 of these claims statewide, so we are interested in trying to resolve them as quickly and efficiently as we can. Just before I sit down, Your Honor, I should say that SUA's counsel represented that two of the roads, the North Swag and the Swallow Park Roads, are now outside the boundaries of the revised national monuments. My understanding is that the North Swag Road is still within the boundaries of the revised national monuments and that the Swallow Park Road, the majority of that road, is within it, but part of it is outside, to the extent that's relevant. Thank you, counsel. I'm going to sit down and let Mr. Welch talk. May it please the Court. Sean Welch speaking for King County, Utah. Ms. Chelsea Davis, who is on this, is also with us. I'm also speaking today for Dave Halverson so we don't have to pass the torch twice for the state and county interests. I do want to slightly correct something that counsel for the United States mentioned. What we're anticipating to close out this case, which is King County 1 or the Bald Knoll case, is not extensive fact-finding and going out and doing new discovery. That was done. That was put into the record. It is having the court make additional findings of fact based on the documents and the testimony that has already been gleaned. Where we're at right now, we do disagree on what the width of the right-of-way should be, not so much the traveling surface. It's what's needed to support the road, to keep it safe for travel. These are all open roads for motorized vehicle travel, all three of them, and so we just have to deal with what's the right width to deal with. I don't like using the term scope. You may have noticed that in the brief. Scope can have all kinds of nuance and decisions with it. As Judge Jenkins held in the very first of this long saga of my career of Rule 24, which is about six opinions now, he said it's about length and breadth. That is what a 2477 road claim is about. That's it. And to look at this and see exactly how that worked in this case, the state's brief, page 8, there is a cite to the merits decision below where Judge Waddups did make the findings of the widths of the right-of-way, and he entered his order and decree quite in title in the state and county. We won some, we lost some. We learn from it. We move on. Drop the bad claims. We're going to do that. We're going to proceed with hopefully the ones where we can reach compromise, where there are no brainers, and the ones in the middle will have to argue over or give up. But what he did was he said, yes, I find that the North Swag and the Swallow Park Road are 2477 rights-of-way, and they're about this wide on the surface, but they need a width of 25 feet. But why I want you to read that section about the width is there's another road there. If you start at the Scoot-N-Paw Road and drive east, you cross Swallow Park, Park Wash, North Swag, and the Nipple Lake Road. All he found for the Nipple Lake Road was that it had a 25-foot right-of-way. It didn't say how much it would be used. He didn't change land management. It was very simple title. That is all that is before this court. So when Counsel Persua stands up and says, we're going to argue for limits on motor vehicles, X, Y, and Z, it's in several of the cases the parties have cited, moving to intervene to raise irrelevant or non-material arguments is never a great substantial grounds to warrant intervention. A wide road's going to be more heavily traveled in all likelihood, won't it? A 66-footer versus a 25-footer. Your Honor would have to go drive these roads and you'd understand the self-limitations. I have. Okay, yes, there are self-limitations. If there's motor vehicle travel that is going to... Not these roads, but Utah, Canyonlands. Yeah, the problem I've always had is people who are talking about public highways see a dotted line down the middle. They don't see what exists on the public lands. But if you look at that, you'll see that all that's left is title. Right now, there are no active settlement discussions. The parties are focusing their efforts on this bellwether trial. And through that bellwether trial, we'll see what comes out that may influence the remaining parts of the three roads left here. The simple fact is these roads are just sitting there. They don't need anything. There's not an urgency to decide what to do with the three roads on this remand. Once again, Your Honor, the key point is this case will not change land use management. It doesn't have to do with that. I have tried several times to draw a distinction between the APA cases where the United States not only has to comply with many public laws, but also do with the varied interests that participate through the public process to adopt a land management plan. Those are the cases where this court truly has gone down the line of liberal intervention. This is a title suit. Your Honor got it dead right. This is the fifth time this case is dealing with intervention by the same parties. If you go to the arguments in the first motion to intervene, it's the same they're raising now. Do they need to demonstrate standing? That one was decided. That was raised in San Juan County. At the time, there was a split in the circuits, and the Tenth Circuit did, of course, say you don't need standing to intervene. I guess the common phrase for it is piggyback standing. It does need standing to seek any other relief other than the United States, and there it's put itself into a box. Either it's aligned with and asking for the same relief as the United States, which means there's adequate representation, or if it's going to ask for something different, it has to show its own standing, and in the interim, and the two cases that support that, it's more than Town of Chester. It's Hollingsworth v. Perry as well. In the Western Energy Alliance case, this court noted that San Juan County was abrogated by Hollingsworth v. Perry, and it's the standing issue that came up. Interveners do have to show their standing. If that's true, why haven't they adequately showed a potential injury? They have not done that. It's not in the record. They did not argue that they had standing. It's too late to do it now. We have argued timeliness, but do look at the Wilderness Society v. Kane County. SEWA was a party in that. This court en banc very directly stated the Wilderness Society and SEWA lack credential standing to sue to vindicate federal property interests. When it's a property dispute, SEWA lacks standing. If it's a land management dispute, that's different. Your Honor, I think I've gone a bit far. Appreciate your arguments. Thank you. Two minutes, Kevin. Thank you for the additional time, Your Honor. Three brief points. First, with respect to settlement. This is the first time that we've heard that settlement talks are not going to be renewed or there's no ongoing interest in them. I don't think either the state, the county of the United States, is bound to those representations to the extent their argument before this court. What we know is that they were initiated and that that certainly puts at risk the very concern that Judge Lucero pointed to in the San Juan County case. He said, Should the government change its position at a critical point in litigation or settlement negotiations, SEWA will be left as a mere protester forced to fight the rearguard action by reviewing its motion to intervene at a late stage in the proceedings. SEWA must then confront all of the further procedural difficulties compounded by the unavoidable delay as well as a huge burden of persuading the court to do it all over again. Judicial economy and fairness demand more. The government has said for the first time here they will argue for the narrowest possible rights. Again, that's the first time that we've heard this. It's not a representation made in the briefs and I don't think that it's anything that they're bound by. But in all events, what you haven't heard is that the United States' interest and SEWA's interest are identical with respect to scope. There's no representation that scope will be advanced from the perspective of conservation and preservation, which is the directive from this court in the remand order, 772 F3rd at 12-0, I'm sorry, 24. Finally, scope is not a formulaic exercise. This is not a just by the numbers, we'll let the law decide what the scope is. We know from the previous appeal that the district court got it wrong one time. We know from the Hodel opinion that it's not a formulaic exercise. We know from the Garfield County case that the interpretation of scope, even for just one route, can take many days of trial and many pages of briefing. And to the extent the representation is that it's just going to be a very simple process, in our view, that is a red flag for this court to say the United States does not represent SEWA's interest in this case. Thanks. Thank you, counsel. We appreciate the arguments. Once again, you're excused.